**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ANDREW ESPINOSA,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 04-C-5642** |
| **v.** ) | |
| **O'CONNOR CHEVROLET, INC.,** ) | **HONORABLE DAVID H. COAR** |
| ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Andrew Espinosa ("Plaintiff") is suing his former employer, O'Connor

Chevrolet, Inc. ("Defendant" or "O'Connor Chevrolet") for violation of the Americans with

Disabilities Act ("ADA") and the Age Discrimination in Employment Act ("ADEA"). Before

this court comes Defendant's motion for summary judgment in its favor. For the following

reasons, Defendant's motion is DENIED.


**I.     SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).   A genuine issue of material fact exists only if there is

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   When reviewing a motion for summary

judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. <u>See</u> <u>Schuster v. Lucent Technologies, Inc.</u>, 327 F.3d 569, 573 (7th Cir. 2003).

The movant bears the burden of establishing that no genuine issue of material fact exists. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must set forth specific facts demonstrating that there is a genuine issue for trial. <u>Fed. R. Civ. P.</u> 56(e); <u>Celotex</u>, 477 U.S. at 324. To successfully oppose the motion, the non-movant must designate these facts in affidavits, depositions, answers to interrogatories, or admissions; the non-movant cannot rest on the pleadings alone. <u>Celotex</u>, 477 U.S. at 324. "A scintilla of evidence in support of the non-movant's position is insufficient," <u>Anderson</u>, 477 U.S. at 252, and the non-movant "must do more than simply show that there is some metaphysical doubt as to the material fact." <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. <u>Anderson,</u> 477 U.S. at 255.

## II.    FACTS[1]

Plaintiff's Complaint alleges that Defendant refused to accommodate his disability despite its ability to do so, and terminated him because of his disability and age.  Plaintiff was born February 28, 1945.


Plaintiff's Disability

Plaintiff had quadruple bypass surgery on his heart in 1998.  For approximately two years after the surgery, Plaintiff was unable to work and collected SSI disability benefits.  It took the two years for Plaintiff to gain the ability to walk for approximately two hours before experiencing severe leg pain or difficulty breathing.  As a result of the circulatory problems associated with his heart, Plaintiff suffers from chronic leg pain, difficultly breathing, general fatigue, arm pain, and headaches.  On occasion, Plaintiff's leg pain has been so severe that he is unable to walk.  At a previous job, an ambulance was called and ambulance personnel advised him to lay down.

Thus, Plaintiff's claimed disability is poor circulation.  Working as a car salesman permits Plaintiff to take frequent breaks to mitigate the leg pain and difficulty breathing caused by this condition.  Still, being on his feet five consecutive days requires Plaintiff to recuperate. In addition, although Plaintiff considered himself available to work a full-time schedule and overtime at O'Connor Chevrolet, work did make Plaintiff tired and cause him stress.  On the job, there were times Plaintiff experienced pain, and times he did not.  At home, Plaintiff's problems are minimized because he has the opportunity to rest and take breaks there.

---

[1] Unless otherwise stated, the facts are taken from the Parties' Local Rule 56.1 materials.

Plaintiff's Job Interview

O'Connor Chevrolet hired Plaintiff as a sales consultant on or about July 13, 2001. The Parties dispute not only the content of the interview, but also who conducted the interview.

Plaintiff testified that he was interviewed by Tom Maracich ("Maracich"), one of O'Connor Chevrolet's Sales Managers, and Sean Galvin ("Galvin"), O'Connor Chevrolet's General Manager. Plaintiff states that he advised Maracich and Galvin during the interview that he suffered from physical disabilities. Specially, Plaintiff told them that a couple of years earlier he had quadruple heart bypass surgery, and that he continued to experience physical problems associated with his permanently damaged heart such as chronic leg pain and difficultly breathing and walking if he did not get constant breaks. Plaintiff advised Maracich and Galvin that, in addition to needing frequent breaks while at work, he would have to take Mondays off so that he would have two consecutive days off every week (Sunday and Monday). At the time Plaintiff was hired, Galvin commented that a request by an employee paid by commission to take Mondays off was unusual since Mondays are typically very busy days.

Maracich and Galvin, however, do not recall if they interviewed Plaintiff. Moreover, Defendant states that it is not aware of Plaintiff mentioning his physical condition or his need to take Mondays off, or of Galvin's comment about the uniqueness of Plaintiff's request. In fact, Defendant states that it never had knowledge that Plaintiff suffered from any disability that severely limited his ability to walk, stand, or work.

Regardless, the Parties do not dispute that Plaintiff was hired and given a work schedule that provided for Sundays and Mondays off. Plaintiff worked this schedule until October 2002. Plaintiff worked as a full time employee and worked overtime.

Plaintiff's October 2002 Schedule Change

In October 2002, Plaintiff's work schedule was changed with the result that Plaintiff no longer had two consecutive days off. The Parties dispute exactly what happened.

Plaintiff states that when he learned of the change, he approached Maracich to remind him that Plaintiff still required two consecutive days off every week. Maracich responded by suggesting that Plaintiff look for some other kind of job because Plaintiff was perhaps too old and too sick for his current job. Defendant denies this comment and also maintains that Plaintiff only approached Maracich to mention that he wanted Mondays off so that he could watch his grandchildren.

Both Parties admit that Plaintiff thereafter gave Defendant a note from his doctor, dated October 12, 2002, which states: "To whom it may concern: Due to Andrew's hypertension and chronic leg pain it is my recommendation that he is permitted to be off work on 2 consecutive days. For example, Sunday and Monday. He is also followed regularly by a cardiologist from his heart bypass surgery."[2] Plaintiff maintains that Galvin saw this note; Galvin has testified that he does not remember if he saw this note. The Parties agree that Plaintiff was allowed to return to his regular work schedule with Mondays off.

_____

[2] Defendant objects to this doctor's note as inadmissible hearsay evidence. The note is not hearsay, however, as Plaintiff is not offering it to prove the truth of the matter asserted. See Fed. R. Evid. 801(c) (defining hearsay). Rather, Plaintiff has offered the note to prove that Defendant was on notice of Plaintiff's alleged disability.

<u>Plaintiff's Termination</u>

On Friday, May 17, 2001, Galvin decided to keep the store open past the usual closing time of 7:00 p.m. The Parties agree that when Defendant decides it will require its salesmen to work beyond their normal punch out time, it is custom and practice for the sales managers and the General Manager to gather the salesmen in an area known as the "Sales Tower" and to make an announcement to that effect. The Parties, however, provide markedly different accounts of what happened that particular Friday.

Defendant claims that all employees were advised that they would need to stay until 9:00 p.m.; no announcements are made at the Sale Tower until all salesmen are present and accounted for, thus, Plaintiff must have been present. According to Defendant, despite being told he had to stay late, Plaintiff chose not to talk to anyone in management to confirm or deny whether what he had been told was accurate. Plaintiff did not ask anyone in management because he wanted to leave.

Plaintiff denies that all employees were advised they needed to stay late. Plaintiff testifies that he was never told by a manager, as was Defendant's custom and practice, that he had to work late. In fact, neither the Sales Managers (Maracich or Frank Flewelling ("Flewelling")) nor the General Manager (Galvin) recall telling Plaintiff that he would have to work late. Rather, Plaintiff was told by a non-management employee who had a reputation for being a "kidder" that all salesmen had to work until 9:00 p.m. Thus, at approximately 7:00 p.m, his normal time to leave, Plaintiff punched out. Plaintiff went home because as far as he knew he shift was complete, he wanted to leave, and he had not been told by anyone in management that he had to work late.

The Parties agree that after 7:00 p.m. Galvin was advised that Plaintiff and another employee, Gerardo Rangel, had left work early without permission. The Parties disagree as to what happened next.

Plaintiff claims that Defendant called his home that evening and told his wife (who answered the telephone in his absence) that he "walked off the job." (Pl's Mem. in Opp. to Def.'s Mot. for Summ. J., Ex. A at 34.) Plaintiff then reported to work on Tuesday, May 20, his next normally-scheduled work day. Flewelling, a Sales Manager, approached Plaintiff at 10:00 a.m. Flewelling told Plaintiff that, as a result of not working late on Friday, Plaintiff would was going to lose his vacation set for later in May, and he was going to have to work six days a week from 9:00 a.m. until 9:00 p.m. from May 20th through the end of the month. Plaintiff told Flewelling that he could not work that schedule because of his condition and that he would like to speak with Galvin about the matter. Plaintiff continued to work until approximately 6:00 p.m. when he approached Galvin. Plaintiff attempted to engage Galvin in a conversation and informed him that he could not work the new schedule. Galvin responded that Plaintiff had to or he would be terminated. Plaintiff asked Galvin to explain the schedule change, but Galvin would not speak to or meet with Plaintiff. Galvin told Plaintiff that he would have to work every day except Sunday for the remainder of the month. Galvin asked Plaintiff if he was going to work the new schedule and Plaintiff explained that he could not because of his condition. Galvin then told Plaintiff he was terminated. Thus, Plaintiff maintains that he was not terminated on Friday, May 17, 2003, but on Tuesday, May 20, 2003 when he indicated he could not work the additional hours.

By contrast, Defendant claims that Galvin decided to terminate Plaintiff and Rangel for insubordination the same day they failed to work late (Friday, May 17, 2003). Thus, Galvin instructed one of the managers to call Plaintiff's home to advise him of the termination decision and ask him to return the demonstrator automobile being provided to him. Plaintiff's home was called and his wife was given the above information. Defendant then claims that Plaintiff came to O'Connor Chevrolet on Tuesday, May 20, 2003 to discuss what happened.

Defendant maintains that Plaintiff *did not* have a regularly-scheduled work day that Tuesday, as he had already been fired. Defendant denies Flewelling told Plaintiff anything Plaintiff alleges Flewelling said in the previous paragraph, and denies that Plaintiff told Flewelling he could not work due to an alleged condition. Instead, Defendant maintains that Plaintiff spoke to Galvin when Galvin arrived at work at 1:00 p.m. Galvin spoke to Plaintiff about the terms upon which he could be re-employed. Specifically, Galvin advised Plaintiff that he had the opportunity to work 9:00 a.m. to 9:00 p.m. on his two short days (days on which Plaintiff would normally work 9:00 a.m. to 6:00 p.m. or 1:00 p.m. to 9:00 p.m.). Galvin says he never told Plaintiff he had to work on Mondays, on every day except Monday, or lose his vacation time. Moreover, Galvin claims Plaintiff never explained to him that he could not work the new schedule because of any alleged condition. According to Defendant, May 20 is merely the date on the termination paperwork because that is when Galvin met with Plaintiff. Galvin is not sure, however, when he completed the paperwork.

The Parties agree that there was no business reason why Defendant could not have continued to allow Plaintiff to have two consecutive days off each week. Defendant denies that

Plaintiff's sales performance had anything to do with Plaintiff's termination. Galvin testified that Plaintiff was an average salesman that he wanted to retain as an employee.

Gerardo Rangel

On May 17, 2003, another sales consultant, Gerardo Rangel ("Rangel"), also failed to work late. Rangel's date of birth is March 26, 1977, and he has never suffered from any physical disability. Rangel testified that he was told by a Sales Manager on May 17 that he would have to work later than normal that evening. Rangel, however, decided not to work late. Galvin stated that Rangel decided not to work late because it was his anniversary.

The Parties disagree as to what happened thereafter. Rangel claims that when he returned to work on his next scheduled work day, he was informed by a Sales Manager that, because he refused to work late on Friday, he may have to work "full days" on his scheduled "short days" for the rest of May 2003. Rangel was advised that if he did not work these additional hours he would be terminated. The Parties and Rangel agree that he was not told he would lose any of his days off or vacation time. Rangel testified that he never agreed to work the additional hours, and he never did work the additional hours. Indeed, Defendant's record of the hours Rangel worked between May 19 and May 31, 2003 indicates that: (1) he did not work on Wednesday, May 21; (2) he worked from 1:09 p.m. until 8:49 p.m. on Friday, May 23; (3) he did not work on Wednesday, May 28; and (4) he worked from 1:32 p.m. until 9:05 p.m. on Friday, May 30. Defendant does not dispute this record.

Plaintiff denies that he and Rangel were offered the same terms for continuing employment. Plaintiff states that the schedule he was given was more demanding than the

schedule merely suggested to Rangel. Plaintiff could not work Mondays for medical reasons known to Defendant and Defendant refused to even discuss a reasonable accommodation with Plaintiff. Rangel was never told he was *required* to work additional hours, he never agreed to work additional hours, he did not work additional hours, and he was not terminated.

Defendant, on the other hand, claims that both Plaintiff and Rangel were offered the opportunity to work a "full schedule" the remainder of the month to regain their employment. (Def's Statement of Material Facts ¶ 22.) According to Defendant, Maracich told Rangel upon his return to work that Rangel could work from 9:00 a.m. to 9:00 p.m. on his short days for the reminder of May 2003. Defendant maintains that this was merely an option offered to Rangel to be re-employed; Rangel was already terminated when the conversation took place. Defendant denies that Rangel never agreed to work the additional hours and never did work them; instead, Defendant claims that Rangel said "no problem" to the offer and Defendant "believes" and "guesses" Rangel worked the hours required by management. (Def.'s Reply to Pl.'s Statement of Additional Material Facts ¶¶ 53, 57, 58.) Flewelling testified that no one was responsible for confirming whether Rangel worked the additional hours, and Maracich testified that he was not individually responsible for confirming that information. In any event, Defendant claims that the reason Rangel continued to work for Defendant was because agreed to work the 9:00 to 9:00 schedule, not because he actually worked the schedule. Galvin testified that Plaintiff would have continued as an employee if Plaintiff had complied as Rangel did.

Rangel voluntarily resigned from O'Connor Chevrolet on or about July 31, 2003.

<u>Hiring and Promotions After Plaintiff's Departure</u>

After Plaintiff's termination, Defendant hired or promoted seven employees, all of whom were under the age of 40, into its Sales Department. Hector DeLaRiva was hired on May 24, 2003 and was born on November 25, 1985. Tony Urbina was hired on May 30, 2003 and was born on July 3, 1974. Stanley Vaughan was hired on June 3, 2003 and was born on May 7, 1992.[3] Eric Barnes was hired on June 10, 2003 and was born on December 14, 1983. Kendall Griffin was hired on June 12, 2003 and was born on December 11, 1977. Joe Loza was hired on September 4, 2003 and was born on March 29, 1980. Frank Motes was hired on September 4, 2003 and was born on April 25, 1983.

## III.    DISCUSSION

Defendant argues that summary judgment is appropriate for both Plaintiff's disability discrimination claim and his age discrimination claim. First, according to Defendant, Plaintiff cannot prove that he is disabled under the ADA. Even if he could, Defendant argues, Plaintiff cannot show that he suffered an adverse employment action because of his disability. Finally, Defendant argues that Plaintiff cannot point to evidence showing that Defendant did not honestly believe the explanation for his termination.

---

[3] Despite the improbability of this birth date, the Court recites the fact as stated in the Parties' Local 56.1 Rule materials.

## A.     ADA Claim

A plaintiff with an ADA claim who seeks to avoid summary judgment "must demonstrate that there is at least a genuine issue of material fact as to whether he is disabled, whether he can perform the essential functions of the position, and whether he has suffered an adverse employment action because of his disability."  Kupstas v. City of Greenwood, 398 F.3d 609, 611 (7th Cir. 2005).

A plaintiff must establish a claim for failure to accommodate by showing that: (1) he is a qualified individual with a disability; (2) the employer was aware of his disability; and (3) the employer failed to reasonably accommodate the disability.  See E.E.O.C. v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005).  To survive summary judgment on his failure to accommodate claim, Plaintiff must show that there is a genuine issue of material fact as to each of these issues as well.

### 1.     Is Plaintiff a Qualified Individual With a Disability?

The ADA protects "qualified individual[s] with a disability," defined as those "individual[s] with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8) (2005).  Defendant does not dispute that Plaintiff could perform the essential functions of his position as a sales consultant at O'Connor Chevrolet.[4]  Rather, Defendant argues that Plaintiff cannot survive summary judgment because Plaintiff does not have a disability as defined by the ADA.  Under

---

[4] According to Defendant, Plaintiff was an average salesman it wanted to retain as an employee and Plaintiff's sales performance had nothing to do with his termination.  Similarly, Defendant maintains that, but for Plaintiff's alleged insubordination and refusal to work the schedule offered him, Plaintiff would have retained his job.

the ADA, an individual has a "disability" if he: (A) has a physical or mental impairment that "substantially limits" one or more of the major life activities of such individual; (B) has a record of such an impairment; or (C) is regarded as having such an impairment. 42 U.S.C. § 12102(2)(2005).[5] The term "substantially limits" means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (emphasis added). See also Sears, 417 F.3d at 800 (holding that Supreme Court precedent does not prevent courts from looking to EEOC regulations for guidance). Plaintiff claims that his impairment substantially limits him the major life activities of breathing and walking.[6]

---

[5] Because of this definition, Defendant's argument that Plaintiff is not disabled because (a) he did not note any physical limitations or disabilities on his July 13, 2001 employment application and he stated on that application that he was available for full time and overtime work; and (b) he checked the box on a health insurance form in 2002 indicating that he was not disabled or unable to perform normal activities. These facts are irrelevant to the issue of whether Plaintiff is a qualified individual with a disability under the ADA. First, it would be a violation of the ADA for Defendant to inquire whether a job applicant has a disability. See 42 U.S.C. § 12112(d)(2)(A) (2005). Second, there is no testimony that Defendant's decision maker, Sean Galvin, saw or relied upon the health insurance form. Third, the health insurance form merely asks whether the applicant is disabled, not disabled for the purposes of the ADA. Indeed, in asking whether the applicant is "unable to perform normal activities," the form suggests a different definition of disability than the definition used by the ADA. (Def's Mot. for Summ. J., Ex. E at 2.) Under the ADA, an individual may be able to perform normal activities and still be considered an individual with a disability because he or she needs reasonable accommodation in order to perform those activities. Thus, Plaintiff's admissions on his job application and health insurance form are not as instructive to this Court as Defendant hopes.

[6] Breathing and walking are major life activities encompassed by the ADA. 29 C.F.R. § 1630.2(i) (2005).

-13-

First, as regards breathing, the evidence taken in the light most favorable to Plaintiff demonstrates that Plaintiff must take frequent breaks during his workday to retain his ability to breath. Furthermore, Plaintiff must rest and be careful not to exert himself for two consecutive days to avoid more problems with his breathing. A reasonable jury could conclude, on the basis of this evidence, that Plaintiff's breathing is significantly restricted, especially as compared to the daily precautions, or lack thereof, that most people have to take with regard to their breathing.

Similarly, "[t]o be disabled with regard to the major life activity of walking, the employee must be 'substantially limited' in her ability to walk, and the limitation must be permanent or long term, and considerable compared to the walking most people do in their daily lives. Sears, 417 F.3d at 802. The evidence taken in the light most favorable to Plaintiff demonstrates that he was significantly restricted as to the duration of his walking. Unlike most people, and undoubtedly unlike the other car salesmen at O'Connor Chevrolet, Plaintiff required consistent breaks from walking throughout the sales day. Also unlike most people, Plaintiff needed two consecutive days to recuperate and retain his ability to walk after five days on the job. There is no evidence that Plaintiff's impairment was temporary or short term, as Plaintiff's walking has been impaired since his 1998 surgery. As in Sears, where the plaintiff also had a walking impairment, "[a] reasonable jury could conclude, based on this evidence and its own life experience," that Plaintiff's severe difficulty in staying on his feet for long periods of time is a substantial limitation compared to the walking most people do daily. Id.

In addition, a reasonable jury could find that Plaintiff has a *record* of an impairment that substantially limits a major life activity. In the least, the doctor's note Plaintiff gave to

Defendant constitutes a record indicating that Plaintiff's hypertension and chronic leg pain significantly restricts Plaintiff to a schedule permitting two consecutive days off from work to rest.[7]

In sum, Defendant is not entitled to summary judgment on Plaintiff's ADA claim because a reasonable jury could find that Plaintiff is a qualified individual with a disability.

### 2.    Did Plaintiff Suffer an Adverse Employment Action Because of His Disability?

Defendant also argues that it is entitled to summary judgment because, even if Plaintiff is disabled as defined by the ADA, Plaintiff cannot show that he suffered adverse employment activity because of his disability. According to Defendant, since Plaintiff admits he was advised to stay late, and instead chose to leave, it is clear that Plaintiff was not meeting Defendant's expectations and, consequently, was fired for insubordination.

In asserting as much, however, Defendant relies on material facts that are clearly in dispute by the Parties. For example, Defendant contends that Plaintiff was advised to stay late,

_____

[7] Plaintiff's argument that Defendant also *regards* Plaintiff as disabled fails, but not because, as Defendant argues, Defendant was not aware of any condition Plaintiff had. "A person is 'regarded as disabled' when the employer, rightly or wrongly, believes that she has an impairment that substantially limits one or more major life activities." See Rooney v. Koch Air, LLC, 410 F.3d 376, 382 (7th Cit. 2005). "[I]t is necessary that a covered entity entertain misperceptions about the individual–it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999). Plaintiff asserts that Defendant "regards him" as disabled, but Plaintiff has not actually argued that (a) Defendant believes he has substantially limiting poor circulation yet he *does not* or (b) Defendant believes Plaintiff's poor circulation is substantially limiting but it is, in fact, not. Therefore, Plaintiff's argument that Defendant regards him as disabled fails. It is not enough to argue, as Plaintiff does, that Defendant "regards" Plaintiff as having a disability simply because Defendant knew about Plaintiff's condition.

yet none of the managers can recall telling Plaintiff, or seeing Plaintiff be told, to do so.  Plaintiff says he was told to stay late by a colleague known for joking, not by a manager as was Defendant's custom and practice.  Furthermore, Defendant maintains that Plaintiff was terminated for refusing to work late and was not re-employed because he did not agree to work a new schedule offered him.  Plaintiff, however, notes that an employee (Rangel) with no known disabilities whom Defendant does not argue is "similarly situated," did not agree to work a new schedule, did not work a new schedule, and yet was re-employed.  Defendant also disputes evidence showing that Maracich told Plaintiff perhaps he was too sick for his job.[8]  Thus, Defendant is not correct that no issues of fact remain for a jury.

Plaintiff also notes that he can offer as evidence the EEOC Determination that Plaintiff was discriminated on the basis of his disability.  Indeed, an administrative finding regarding an employment discrimination claim may, within the trial court's discretion, be used as evidence at trial.  See Young v. James Green Management, Inc., 327 F.3d 616, 624 (7th Cir. 2003).

Thus, Plaintiff has pointed to enough facts that demonstrate a genuine issue of material fact about whether was he terminated because of his disability.


### 3. Was Defendant Aware of Plaintiff's Disability?

"An employer only violates the ADA if it fails to provide 'reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability.'"

---

[8]  Defendant is correct that Maracich's alleged statement is not direct evidence of discrimination as it was not made around the time of and in reference to the adverse employment action. The fact finder may, however, consider the statement since Plaintiff is attempting to prove discrimination via the indirect method.  See Olson v. Northern FS, Inc., 387 F.3d 632, 635 (7th Cir. 2004).

See E.E.O.C. v. Sears, Roebuck & Co., 417 F.3d 789 (7th Cir. 2005) (quoting 42 U.S.C. §

12112(b)(5)(A) (emphasis added)).  Thus, a plaintiff alleging a failure to accommodate "must

show that the employer was aware of the disability and still failed to reasonably accommodate

it."  Id.  The employee has the initial duty to inform the employer of a disability.  Id.  At most, he

must indicate that he has a disability and desires an accommodation.  Id.

There is a genuine issue of fact as to whether Defendant was aware of Plaintiff's

disability, given that Defendant pleads ignorance of Plaintiff's condition whereas as Plaintiff

testifies that he told Defendant about his condition at his interview and later supplied a doctor's

note.  Viewing the evidence in the light most favorable to Plaintiff, including the evidence that

Plaintiff worked a schedule permitting him two consecutive days off from the time he was hired

until the time he was fired (with the exception of approximately a week during October 2002), a

reasonable jury could conclude that Defendant was sufficiently aware of Plaintiff's disability and

need for an accommodation.

### 4. Did Defendant Fail to Reasonably Accommodate Plaintiff's Disability?

The ADA requires an employer to make "reasonable accommodations" to an employee's

limitations unless the employer demonstrates that to do so would impose an "undue hardship" on

the business operation.  42 U.S.C. § 12112(b)(5)(A).  The employer and employee must engage

in an interactive process to determine a reasonable accommodation.  See Sears, 417 F.3d at 805.

If an employee shows that the employer did not reasonably accommodate his disability, "the

employer will be liable only if it bears responsibility for the breakdown of the interactive process." <u>Id</u>.

Given that Defendant accommodated Plaintiff's need for time to rest and recuperate since Plaintiff was hired, it is clear that a reasonable accommodation for Plaintiff's claimed disability was available. Further, Defendant testified that there was no business reason Plaintiff could not have a schedule permitting him two consecutive days off.

There is, however, a genuine issue of fact as to whether, on May 20, 2003, Defendant refused a reasonable accommodation to Plaintiff. Plaintiff testified that he was told he had to work everyday except Monday, including his vacation days, as a penalty for refusing to work late on May 17, 2003. Defendant denies this. There is also an issue of fact as to whether Defendant was responsible for the breakdown in the interactive process. Plaintiff states that Galvin refused to discuss Plaintiff's need for an accommodation on May 20, 2003. Again, Defendant disputes this. "An employee cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives." <u>Id</u>. at 806. A reasonable jury could find, based on the evidence, that this is precisely what happened at O'Connor Chevrolet.

Thus, there is sufficient evidence to allow the question of whether Defendant failed to accommodate Plaintiff's disability and caused the breakdown in the interactive process to be presented to a jury. Defendant is not entitled to summary judgment on Plaintiff's ADA claim.

### B.     ADEA Claim

A plaintiff may establish age discrimination in one of two ways.  He may present direct or circumstantial evidence that age was the determining factor in the adverse employment action, or he may invoke the burden-shifting method outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to create an inference of age discrimination.  See Olson v. Northern FS, Inc., 387 F.3d 632, 635 (7th Cir. 2004).  Under the latter method, an employee must establish a prima facie case by showing: (1) he is a member of a protected class (employees over 40 years of age, see 29 U.S.C. § 631(a)(2005)); (2) he was meeting the employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) the employer treated younger, similarly situated employees more favorably.  See Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 574 (7th Cir. 2003).  If the employee meets this burden, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer does so, the burden shifts back to the employee to present evidence sufficient for a fact finder to find that the employer's explanation is pretextual.  Id.

Defendant moves for summary judgment on several grounds.  First, Defendant appears to argue that Plaintiff cannot establish the fourth prong of his prima facie case because Rangel was not treated differently.[9]  Plaintiff, however, has offered sufficient evidence to demonstrate that this fact is at issue.  Rangel testified that he never agreed to work additional hours, the very

---

[9] Defendant does not argue that Rangel was not similarly situated. Indeed, the evidence shows that Rangel and Plaintiff were similarly situated.  "[I]n disciplinary cases–in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason–a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000).  Plaintiff has pointed to facts in depositions and declarations that support his contention that he and Rangel are similarly situated.

condition Defendant claims had to have been fulfilled before Rangel could regain his job. Still Rangel continued to work at O'Connor Chevrolet, whereas Plaintiff, who also did not agree to work the additional hours, did not. Moreover, Plaintiff presented evidence that Rangel was told by a manager to stay late but did not comply. By contrast, Plaintiff never received a manager's orders to stay late. The evidence in the light most favorable to Plaintiff suggests that Rangel's alleged insubordination was worse, yet his punishment was lighter. Thus, Plaintiff has satisfied the fourth prong of his prima facie case.

Second, Defendant argues that even if Rangel was treated better than Plaintiff, one example is not enough to support an inference of discrimination. This Court, however, has previously held that a plaintiff *can* meet the fourth prong by showing that a single, comparable employee was treated more favorably, especially, where the employees were engaged in the same alleged misconduct. See Ramos v. Schaumburg/Oakbrook Marriott Hotels, Inc., 2003 WL 22682355, at *7 n.10 (N.D. Ill. Nov. 12, 2003) (distinguishing Kuhn v. Ball State Univ., 78 F.3d 330, 332 (7th Cir.1996)). Furthermore, Plaintiff has shown that seven people were hired or promoted in the sales department after his termination. While Defendant is correct that Plaintiff has not yet shown that any of these people were hired to "replace" Plaintiff per se, the evidence viewed in the light most favorable to Plaintiff allows the inference that at least one of these people assumed job duties (selling cars) Plaintiff once had. The Seventh Circuit allows the inference of discrimination in such a case:

> [W]e have held that the inference of discrimination arises in single-discharge cases, sometimes called 'mini-RIFs,' where the terminated employee's duties are absorbed by other employees not in the protected class. The plaintiff in a single-discharge case does not need to make a showing that "similarly situated" employees were treated better because the inference of discrimination arises from

the fact that they were constructively 'replaced' by workers outside of the protected class.

Bellaver v. Quanex Corp., 200 F.3d 485, 495 (7th Cir. 2000) (internal citations omitted).

Thus, it appears from the facts of this case that there is a genuine question of whether a younger employee was treated more favorably than Plaintiff and whether younger workers were hired to absorb Plaintiff's duties.

Third and most central to Defendant's motion is the argument that Plaintiff cannot meet his burden of showing Defendant's reason for firing Plaintiff is pretext. "If the evidence does not amply support [a] plaintiff's claim that the defendant's explanation is unworthy of credence, judgment as a matter of law is entirely appropriate." Giannopoulos v. Brach & Brock Confections, Inc.1, 109 F.3d 406, 411 (7th Cir. 1997) (internal citations omitted). If, on the other hand, "the employee succeeds in casting doubt on the proffered reason for the dismissal, the ultimate question of whether the employer discriminated against the employee must be left for a jury to consider." O'Connor v. DePaul University, 123 F.3d 665, 670 (7th Cir. 1997). The question, then, is whether Plaintiff has presented sufficient evidence of pretext to allow a reasonable jury to infer that Defendant terminated Plaintiff because of his age rather than insubordination. See Vaughan v. Roadway Express, Inc., 164 F.3d 1087, 1090 (7th Cir. 1999). Plaintiff presented evidence that a younger employee received less harsh treatment and that younger workers were hired after he was terminated. This evidence, coupled with Maracich's alleged remark that perhaps Plaintiff was too old to do his job, is sufficient to let a jury decide

whether age actually played a role in Defendant's decision to terminate Plaintiff. Thus, Defendant is not entitled to summary judgment on Plaintiff's ADEA claim.[10]

## IV.     CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment in its favor is DENIED.


Enter:


/s/ David H. Coar

David H. Coar
United States District Judge

Dated: **December 30, 2005**

---

[10] Defendant also argues that, although Plaintiff signed O'Connor Chevrolet's Discrimination and Sexual Harassment Policy on May 8, 2002, he never reported any claims of discrimination to the company prior to his termination. Whether Plaintiff reported any claims of discrimination is irrelevant to the determination of the issues Defendant has raised in its motion for summary judgment.